UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | Case No.: 13-12120 |
| LEVEL III TRADING PARTNERS, LP | |
| Debtor | Chapter 11 |
| | Judge Magner |

**KENNETH A. McASHAN,**
**GREGORY C. SAMPOGNARO, et al**

    **Plaintiffs**

    Versus                                           Adv. Proc. Number: 14-01004

**BRUCE A. GWYN**

    **Defendant**

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs offer the following facts and admissions, developed in the lead case, to support the premise asserted in their Complaint and Motion for Preliminary Injunction that the bankruptcy estate likely has multiple causes of action against Bruce A. Gwyn:

**Preliminary Note on Exhibits:**

In support of the facts alleged in this memorandum, plaintiff attach and incorporate the following documents obtained through discovery in the lead case:

| | |
|---|---|
| Exhibit 1: | Transcript of Rule 2004 examination of Bruce A. Gwyn |
| Exhibit 2: | Answer filed by Bruce A. Gwyn to the Complaint of the National Futures Association, before the Business Conduct Committee of the National Futures Association. |
| Exhibit 3: | Amended Operating Agreements of Gaga, LLC |
| Exhibit 4: | Bank statements from Gaga, LLC |
| Exhibit 5: | Bank statements from Basco, LLC |
| Exhibit 6: | 12/2012 Trial Balance from Audit of Level III Trading Partners, LP by Fund Associates |

I.  **Breach of Fiduciary Duty, Self-Dealing**

As general partner of Level III, Bruce A. Gwyn ("Gwyn") liquidated all of the fund's commodities investments, and transferred the proceeds to companies in which he had a direct interest as member, officer, and/or director.[1] This kind of self-dealing was not authorized by Level III's partnership agreement, nor was it disclosed to investors.[2] One example of these self-dealing transactions carried out by Gwyn is as follows:

In 2010, Gwyn owned 50% of Gaga, LLC, along with Henry R. Albert, III, a personal friend of Gwyn, who owned the other 50%.[3] In June of that year, Gwyn, acting in the capacity of general partner and fiduciary of Level III, bought membership interests totaling 24% of Gaga, LLC.[4] For this membership interest, Level III paid Gaga, LLC $311,000.[5] This transaction was not disclosed to the limited partners of Level III.[6] No independent valuation of Gaga, LLC was obtained by either party to the transaction.

Gwyn was on both sides of this transaction, and the bank statements of Gaga, LLC show that a substantial amount of the proceeds of this transaction went to Gwyn personally.[7] It appears that Gwyn arbitrarily valued Gaga, LLC at approximately $1,400,000 in 2010.[8] Later, Level III obtained an opinion from the Business Valuation Group, Inc., which valued Level III's 24% interest at $62,000—less than one-fifth of the value assigned to it by Gwyn.[9]

---

[1] Examination of Bruce A. Gwyn ("Examination,") pages 39 to 41, page 51 to 53, 188 to 190. Answer to Complaint, NFA Business Conduct Committee ("NFA answer,") ¶ 26.
[2] Examination pg. 42, 43, 46. NFA Answer, ¶ 26.
[3] Examination pg. 83, pg. 105.
[4] *See* amended operating agreements of Gaga, LLC.
[5] *See* amended operating agreements of Gaga, LLC. Examination, pg. 102.
[6] Examination pg 184-185.
[7] *See* GAGA bank statements; NFA Answer, ¶50; Examination pg. 106.
[8] Examination, pg. 113.
[9] See attachment to Schedule B of *In re Level III Trading Partners, LP.*

Not only should Level III institute a suit to rescind this transaction, but it could also provide the basis for a private securities fraud action under Rule 10b-5 of the Securities Exchange Act of 1934 and under Louisiana civil fraud laws. At the meeting of creditors, and in the 2004 examination, Mr. Gwyn testified that there were no transactions engaged in by Level III that did *not* involve a business in which Mr. Gwyn was also an owner, officer, or director.[10] Gwyn never disclosed to the limited partners that he had or intended to transfer 100% of the assets of the partnership to other business entities in which he had a direct or indirect interest.[11]

## II. Conflicts of Interest

Gwyn has a direct financial interest in all of the entities in which Level III is invested, including serving as an officer and a director in the two largest companies in which the fund was invested:[12] Treaty Energy Corporation ("Treaty"), where he is the COO and a director, and Orpheum Property, Inc. ("Orpheum"), where he serves as a director.[13] Level III's Disclosure Statement puts a gloss on this conflict by calling it a "dual fiduciary responsibility," and suggests that what is good for Treaty and Orpheum is good for the bankruptcy estate. This ignores blatant past and continuing conflicts of interest. These conflicts are illustrated by the fact that, after Level III invested substantially in Orpheum (the single largest investment of the debtor), Mr. Gwyn, as director of Orpheum, authorized the issuance of a significant amount of new shares in the corporation, resulting in a direct and ascertainable loss to Level III.[14] For example, on April 3, 2012, a share of Orpheum was $2.75; after dilution, the price fell to $1.01 by April 25, 2012, and

---

[10] *See* US Trustee's recording of meeting of creditors. Examination pg. 182, 183, 184, 185.
[11] Examination pg. 186, ln 8-11; Answer to NFA Complaint, ¶ 26.
[12] NFA Answer ¶ 26.
[13] Examination pg. 68, ln. 17.
[14] Examination pg. 73, ln. 5-24.

to $0.05 by July 25, 2012. The price has gone as low as $0.03 and has traded at $0.12 since November 8, 2013.[15]

In 2010 and 2011, Level III, acting through Gwyn, extended substantial loans to various private companies in which he or Henry R. Albert, III were also interested, including Rare Cuts, LLC, Live Magic, LLC, and Doctor Henry, LLC. Those loans were never repaid; rather, through Gwyn or Henry R. Albert, those loans were converted to shares in Orpheum, which are worth substantially less than the notes owed to Level III. Again, we find Gwyn on both sides of the transaction as a director of Orpheum and the general partner of Level III.[16]

Treaty pays Mr. Gwyn approximately $100,000 per year in compensation, where he serves as an officer and director.[17] Level III purchased approximately $10,000 in Treaty stock, and currently holds 150,000 shares.[18] As of this date, those shares are worth $900.[19] More importantly, Level III holds a 5% overriding royalty interest in Treaty oil and gas wells. That royalty interest was valued by Business Valuation Group, Inc. at $1,169,000 as of September 30, 2012. That value was based on anticipated royalty payments to Level III in the amount of $670,000 in 2013 and 2014, and $500,000 in 2015, and diminishing gradually for several years.[20] To date, however, the debtor has disclosed no income from this royalty interest. If the royalty interest is in fact not producing any money, this raises serious questions about the management of Treaty's potential liability to the bankruptcy estate, and directly implicates Mr. Gwyn in a conflict of interest between the bankruptcy estate and Treaty.

---

[15] Prices as reported by Bloomberg.com.
[16] Examination pg 80, 87-88.
[17] Examination pg. 171.
[18] Examination page 62, Business Valuation Group, Inc. report attached to Schedule B in *In re Level III Trading Partners, LP*.
[19] Price per share of TECO, $0.006 as reported by Bloomberg.com on February 3, 2014.
[20] Page 15 of *Orpheum Property Inc. and Treaty Energy Corporation* by Business Valuation Group, Inc. Submitted by Bruce Gwyn as Exhibit A in his answer to the complaint of the NFA, and attached to Schedule B in the lead case.

The competing loyalties created by Mr. Gwyn serving as an officer and director of Treaty and as the general partner and representative of Level III has already negatively impacted the bankruptcy estate. Mr. Gwyn's testimony in the Rule 2004 examination shows clearly that his competing fiduciary duties to Treaty and to the estate has hindered Treaty from re-acquiring Level III's royalty interests. Mr. Gwyn testified that Treaty may want to reacquire the royalty interest, but that *he* is not sure it is "good for treaty," acknowledging the obvious tension between his two roles.[21]

### III.  Breach of Fiduciary Duty, Mismanagement

Andrew Reid was interested in every transaction Level III engaged in, either as a member, officer, or director of every entity in which the fund was invested, through Orpheum, or through Rampant Leon Financial Corporation. Gwyn admits that he did not do any investigation into Reid before investing all of Level III's money into assets related to Reid.[22] Gwyn failed to disclose to the fund's participants material information about Reid, who along with Gwyn, served as an officer, director, agent, or in some other capacity for virtually every entity in which the fund was invested.[23] Notably, in July 2004, FINRA (through its predecessor the NASD) permanently barred Reid from associating in any capacity with any other FINRA member due to his conversion of customer funds.[24]

As previously addressed, without notice to investors, Gwyn abruptly shifted from trading commodities in 2010 to investing in businesses controlled by Andrew Reid, and this change in investment strategy is detailed by Gwyn in the Rule 2004 examination.[25] Gwyn acknowledges that

---

[21] Examination, pg 32 to 34.
[22] Examination, pg 178 to 180.
[23] NFA Answer, ¶ 27.
[24] NFA Answer, ¶ 27.
[25] Examination, pg 186-188, 190.

Level III has suffered a serious decline in value as result of this change, and that the majority of the value of Level III is made up of the royalty interest which Gwyn personally gave to the fund as gift.[26] As previously discussed herein, the value of that royalty interest should be viewed with skepticism since the debtor has made no report of it producing any cash whatsoever since the filing of this case. The remaining assets of the fund, as discussed herein, appear to have been lent to certain private companies later acquired by entities related to Andrew Reid, and that debt was converted to shares in Orpheum.[27] At the very least, this management history is enough to make it likely that the bankruptcy estate has causes of action against Gwyn for breach of the duty of care and other causes of action based on this conduct.

### IV.     Misappropriation of Funds

The extent to which Mr. Gwyn personally profited from Level III, arguably at the expense of the investors, is not fully known, partly because Mr. Gwyn has failed to fully comply with the court's order of December 4, 2012, ordering him to produce copies of his personal tax returns and personal bank statements. What is known is that Gwyn transferred significant amount of cash from Level III to his personal accounts.[28] It is also known that Gwyn paid himself over $260,000 in 2012, in addition to payments characterized as rent, office expenses, or administration. His wife, Anne Marie Gwyn, was also paid $3,000 per month from the partnership, for "administration."[29] Plaintiffs suggest Anne Marie Gwyn delivered no services to the partnership, and the partnership derived no value from these payments. Meanwhile, the fund's bank account was either overdrawn or had minimal balances from December 2011 through June 2012.[30]

---

[26] Examination, pg 188, 189.
[27] Examination, pg. 88.
[28] NFA Answer, ¶¶ 14 – 16.
[29] Audit report from Fund Associates.
[30] NFA Answer, ¶ 19

As discussed herein, Level III invested substantially in Gaga, LLC, in which Gwyn is a member. Gaga, LLC is a minority member in Basco, LLC.[31] Gwyn withdrew money from Basco, LLC's accounts, and otherwise misappropriates funds, for his own benefit.[32] Gwyn personally received the proceeds from a number of transactions involving the securities account of Basco, LLC, including the sale of Treaty Energy Corporation stock.[33] The foregoing facts suggest that it is likely that the bankruptcy estate has causes of action against Gwyn related to the personal benefits he received from Level III.

### V. An Asset Freeze is Appropriate

The plaintiffs herein seek a preliminary injunction to freeze Gwyn's assets, so that they will be preserved to satisfy possible future judgment in favor of the bankruptcy estate. The four elements for obtaining a preliminary injunction are: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.[34] The facts as detailed in the foregoing memorandum show a substantial likelihood of the plaintiffs succeeding on the merits. The threat of irreparable injury that would occur to the bankruptcy estate is substantial because the estate may otherwise be faced with greatly diminished likelihood of recovery of proceeds for creditors. Preserving the assets of Gwyn for the possible benefit of the bankruptcy estate outweighs any threatened injury to Gwyn, because Gwyn will still be afforded an opportunity to defend himself from liability to the bankruptcy estate. An asset freeze injunction,

---

[31] NFA Answer, ¶ 50.
[32] NFA Answer, ¶ 51; see bank statements of Basco, LLC.
[33] NFA Answer, ¶ 51.
[34] *Janvey v. Algure,* 647 F.3d 585, 595 (5th Cir. 2011).

as sought here, is appropriate where equitable claims are present, and as such, it does not disserve the public interest.[35]

For the foregoing reasons, and for those asserted in the Motion for Preliminary Injunction, Plaintiffs pray for an order prohibiting the Defendant from transferring, selling, encumbering, moving, or otherwise alienating his assets during the pendency of the lead bankruptcy case and any adversary cases against him by the bankruptcy estate.

RESEPCTFULLY SUBMITTED:

**Young & Cotter, L.L.C.**

*/s/Adam G. Young*

**Adam G. Young** (LSBA # 30124)
**Patrick C. (Con) Cotter** (LSBA # 33075)
**Laura N. Buck** (LSBA # 34467)
315 South College Road, Suite 163
Lafayette, Louisiana 70503
337-261-8800
337-234-3133 (fax)
adam@youngcotter.com

Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

Undersigned counsel has served a copy of this memorandum on the *pro se* defendant by U.S. Mail, or via email on February 4, 2014.

/s/ Adam G. Young

---

[35] *In re Adelphia Communications Corp.,* 323 B.R. 345, 359 (Bankr. S.D. N.Y. 2005). See also, *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002).